IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**
**Plaintiff,**

      v.                                             Crim. No.: 25 Cr. 41 (DLC)

**SANDRO OLIVEROS-CHERO,**
**Defendant.**

## SENTENCING MEMORANDUM

RESPECTFULLY SUBMITTED,

SULLIVAN|BRILL, LLP
**Attorneys for Sandro Oliveros Chero**

_[signature]_

**By: Steven Brill**

**Dated: February 26, 2026**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**
**Plaintiff,**

v.                                  CRIM. NO.: 25 Cr. 41 (DLC)

**SANDRO OLIVEROS-CHERO,**
**Defendant**

**SANDRO OLIVEROS CHERO'S SENTENCING MEMORANDUM
PURSUANT TO THE UNITED STATES SENTENCING GUIDELINES
AND 18 U.S.C. § 3553(a)**

TO THE HONORABLE
DENISE L. COTE
UNITED STATES DISTRICT JUDGE
FOR THE SOUTHERN DISTRICT OF NEW YORK

**I.     INTRODUCTION**



At 26 years old, Sandro Oliveros Chero ("Sandro), a citizen of Venezuela and high school graduate still has a chance to make something of himself and to prove right his

friends and family that still believe in him. Until his life's choices changed after a family tragedy, Sandro had all the makings of well-raised, well-educated, and well-mannered young man. His crimes were serious, but a deeper look the nature and circumstances of his conduct shows a young man who escaped Venezuela for a better life, and when he made it out, made choices that were equally as immature and foolish as they were dangerous. Sandro spent most of his time here in the United States shoplifting and using and sharing Tusi (a popular drug that contains methamphetamine and ketamine) in his home and at parties. Although, Sandro admitted to possessing firearms in his home, where he lived with others, he did not plead guilty to using or trafficking the firearms. He has not been accused of using the weapon or hurting anyone. To be fair, Sandro was a willing member of the conspiracy but played a relatively low-level role within it.

As the first one on the instant Indictment (and on the companion Indictment before Judge Vyskocil) to accept responsibility for what he has done, Sandro is scheduled to be sentenced before this Court on March 5, 2026. He was officially arrested on this case on February 9, 2025, while in state custody in New Jersey for shoplifting. Notably, he was arrested and detained on the shoplifting charge in New Jersey on October 7, 2024, and held in until he was transferred to the SDNY about 4 months later February 9, 2026. Sandro's advisory guideline range in this case is 24-30 months on Count 1 (RICO Conspiracy) and a mandatory 60-months on Count 2 (924 C). Combined, Sandro faces an advisory guideline level of 84-90 months with a mandatory minimum of 60-months. It is expected that the government will request a guideline sentence. Similarly, Probation recommends 84

3

months, the very bottom of Sandro's advisory guideline range. For the reasons contained in our memorandum, we respectfully recommend a sentence of 60 months. When released, Sandro will be 31 years old, deported back to Venezuela, less foolish, more mature, specifically deterred, and ready to pick up where he left off – as a well raised, well-educated, well-mannered man.

A 60-month sentence is substantial and parsimonious for the following reasons: ***First***, Mr. Sandro personal history and characteristics, as demonstrated by letters attached here as **EXHIBIT A**, show him to have admirable and redeemable characteristics that mitigate his underlying conduct. Sandro is a young man with promise. **Second,** while incarcerated for the past year, Sandro took advantage of the time he was serving and chose to enroll and successfully completed several programs, including, "My Foundation Starting with Me, and "The Power of the Internal Dialogue." Also, the Court is urged to read Sandro's letter as an illustration of his self-awareness of who he is, what got him here, and goals for the future. ***Third***, the nature and circumstances surrounding Sandro's conduct in this case also supports a sentence below the guidelines. Sandro's conduct was not plainly violent, and his drug involvement as much personal use as it was distribution. By any account, although a member of the gang, was not an integral part of the conspiracy.

In no way, do I wish to downplay the seriousness of Sandro's criminal conduct. Joining a gang, possessing firearms and distributing and using drugs deserve punishment. Sandro is facing an advisory guideline in years of 7 to 7 ½ years. Our recommended sentence of 5 years, however, is sufficient to achieve §3553 interests, and will demonstrate

4

that our criminal justice system makes available to sentencing judges the kinds of sentences that afford restraint and reason when one's history and characteristics, and nature and circumstances of their conduct, like Sandro's, justify it.

***Sandro's "personal history and characteristics" are mitigating factors that justify a below guideline sentence of 60 months***

Unlike many other defendants facing sentencing, Sandro does not present himself to this Court as one who had a traumatic upbringing.  This is not a case where the defendant's traumatic childhood provides an explanation for one's opportunities, choices and criminal conduct.  The Court will not hear stories of a broken home, abusive parents or the lack of parental guidance during Sandro's formative years.   To the contrary, Sandro's parents provided him with a safe and stable middle-class home, who attempted to instill into him, values like hard work and education.   Sandro describes his mother and father as "two really excellent parents" [**PSR, page 20**].   He had pets.  He played sports.  With his father, he worked from a young age selling hot dogs from their food vendor business.  His family was close, and he made a positive and loving impression on them.

>His Uncle Jhonny says
>
>```
>I've spent a lot of time with Sandro and witnessed
>his growth as a man. I've seen him work tirelessly
>in his father's business, selling hot dogs and
>hamburgers, always showing a willingness to help his
>family. Sandro has never been one to complain; on
>the contrary, he's always been the first to arrive
>and the last to leave when it comes to supporting
>his dad at work.
>```
> **Exhibit A.**

His Cousin, Jhonaiker emphasizes what Jhonny says,

5

> Ever since I was a little boy, I've always seen
> Sandro as an exceptionally loving person. He has a
> very special way about him; he always greets you
> with a gesture of affection or a word of
> encouragement. In our house, Sandro is the one who
> always makes sure we're all emotionally okay. He's
> incredibly attentive to his sisters and, above all,
> to his son, whom he loves with a tenderness that
> truly touches anyone who sees it. Sandro has always
> been a pillar of support in our family. He's a son
> who adores his mother and grandmother, and he's
> always been willing to work hard alongside his
> father to help out at home. **Exhibit A.**

To this day Sandro remains close with his mother, who resides in Peru, and his father, who resides in the Bronx, and each of his siblings. Both continue to provide support during this troubling time in Sandro's life. Both will be there, in Sandro's life, when he is released.

So why then (How then?) did Sandro squander a childhood of good values and strong guidance and fall apart and veer off track? The answer lies in the brutal murder of his uncle by Nicolas Maduro's ("Maduro") paramilitary group, the "Collective" in 2017. Sandro vividly recalls Maduro's armed group extorting and threatening his father; by forcing him to make payments so he could safely run his food vendor business. Standing up for Sandro's Father, was Guvara Morales, Sandro's Uncle, his father's young brother. Guvara Morales attempted to thwart this coercion by resisting Maduro's corrupt and violent power, and he paid the ultimate price for it. According to Maduro's police, Mr. Guvara Morales died in the course of a traffic stop due to his own culpable conduct. Understanding that his government was a lawless, dictatorship, Sandro knew better,

6

however.  He knew his uncle had been murdered for daring to confront the despotic government.  His Uncle was only 23.

This devastating event led to dramatic changes to Sandro and is the turning point of his life.  One could say the catalyst from why he is now before the Court.  Due to the paralyzing danger, Sandro, his father and his siblings left their home in Venezuela and relocated to Peru.  Sandro's mother separated from the family and stayed in Venezuela to sell their home, leaving Sandro without his mother until she met him in Peru over a year later.  In evaluating the effect his uncle's murder had on Sandro, relevant to his upcoming sentencing, is that Sandro's Uncle's murder caused him confusion, hopelessness and to become highly cynical.  He found no reason maintain the law-abiding course he was on seeing how life and the life around him was fragile and immensely violent.   He became misguided.  Sandro started to lose his way and associate with the wrong people.  Ultimately, the wrong people were gang members who accepted Sandro and gave him the ugly outlet to misbehave and act out.   When Sandro made his way the US, to seek better opportunity, he remained misguided and continued on this dead-end path.   Unfortunately, he lacked the maturity to break the cycle and reach the true potential that he clearly had as a young man growing up in a stable household.

The Court is urged, therefore, to define Sandro not only by the crimes he committed, but by the true nature of his promise and potential that he clearly has – the promise and potential that he has shown as a young man growing up. That same promise and potential he had when he went to school, worked with his father, and loved and respected his family.

His cousin Edward says it best,

> ```
> I am fully aware that he has made serious mistakes
> for which there is no justification, and I
> understand the seriousness of the legal situation he
> is currently facing. However, I respectfully believe
> it is important for the Court to know that behind
> those mistakes is the person I was raised alongside:
> someone who taught me many important lessons
> throughout my life, who never hesitated to offer a
> helping hand to those in need, and who consistently
> demonstrated respect, support, and solidarity toward
> others.
> ```



Further illustration of Sandro's true self, and how much promise and potential he has, look no further than his choices while incarcerated. Despite the feeling of hopelessness, frustration and fear that an inmate at the MDC may experience, Sandro made good use of his time; and has not wasted time turning his life around. In just over a year, in the midst of countless lockdowns, some lasting weeks, Sandro has completed eight programs with Certificates of Achievement – and counting:

8

1. *Family and Other Relationships*
2. *Adaption*
3. *My Foundation Starting with Me*
4. *Anger*
5. *Personal Growth*
6. *The National Parenting Program*
7. *Practicing Expressing Gratitude*
8. *The Power of the Internal Dialogue*



***In Sandro's Own Words***

We don't know what is to come, but when you listen to Sandro and see him speak you get the sense that he will do all can to avoid breaking the law in the future.

> Buenos días, mi nombre es Sandro Junior Oliveros Cheros. Soy de Venezuela; crecí en Caracas, la capital de Venezuela, en un barrio que queda en uno de los cerros más pobres llamado Propatria, Las Barras.
>
> Durante mi infancia fue una de las mejores etapas, aunque en el cerro donde vivía había mucha rivalidad entre bandas; habían veces donde uno no se podía ni asomar por la ventana. Con todo eso, mis padres me apoyaron en lo necesario porque en mi niñez recuerdo que fui un buen jugador de fútbol, también en mi educación ya que me pude graduar de bachiller.
>
> Me gradué de bachiller en el liceo Almirante Luis Brión Blanco. Pero por la situación en Venezuela, se le hizo muy difícil a mis padres continuar ayudándome con una carrera universitaria, y opté con unirme a mis padres en un negocio de comida rápida. Mi parte del trabajo era entregar los "deliverys" con mis hermanos también, Brayan Alexander Oliveros Cheros y Jhonnatan Kevin Guevara Morales.
>
> En el sector de Propatria (Las Barras), mi papá tenía su negocio y muchas otras personas más donde cada uno de ellos eran extorsionados mensualmente. Ellos eran apoyados directamente por el gobierno de Nicolás Maduro; el grupo se llamaba o se llama "Los Colectivos" y era algo que era imposible de parar. En una de las recolectas de la "vacuna", mi hermano mayor se dio cuenta de lo sucedido porque mi papá estaba discutiendo porque a veces había semanas donde se hacía el dinero para pagar la vacuna como a veces no.
>
> ¡Muerte de mi Hermano!
>
> Mi hermano muere por causa de la discusión que tuvo mi padre con los colectivos por la vacuna, el 09/03/2017. Ellos lo interceptaron cuando mi hermano llevaba un delivery; el hecho sucedido fue en un sector llamado Niño Jesús de Propatria, donde ellos tienen el control total de la población.
>
> Eso me afectó mucho tanto a mí como a mi madre, mi padre y mi abuelita. Mi hermano tenía familia, entre ellos una hija; eso nos cambió la vida y fue cuando decidimos irnos de Venezuela a Perú, Lima. La muerte de mi hermano fue la razón por la que salimos de Venezuela; además, la situación estaba mal, el dinero no alcanzaba para comprar comida, se iba la luz y no había agua.
>
> Llegamos a Perú en el 2018, donde mi abuelo nos recibió, que es el padre de mi madre de nacionalidad peruana. Trabajé como vendedor de golosinas en el sector Jirón Ayacucho, en el centro de Lima. Allí trabajé ambos años, reuní, me compré una moto de 3 ruedas y trabajé como mototaxi hasta el 2023.
>
> Fue cuando decidimos venirnos para el "sueño americano", a los Estados Unidos de América, para una mejor vida y sacar a nuestra familia adelante. Llegué a Estados Unidos

(Translated from Spanish)
Good morning, my name is Sandro Junior Oliveros Cheros. I am from Venezuela.

I grew up in Caracas, the capital of Venezuela, in a neighborhood that is in one of the poorest hills called Propatria, Las Barras. During my childhood it was one of the best stages, although on the hill where I lived there was a lot of rivalry between gangs; There were times when you couldn't even look out of the window. With all that, my parents supported me in whatever was necessary because in my childhood I remember that I was a good soccer player, also in my education since I was able to graduate from high school.

I graduated from high school at the Almirante Luis Brión Blanco high school. But because of the situation in Venezuela, it was very difficult for my parents to continue helping me with a university career, and I chose to join my parents in a fast-food business. My part of the job was to deliver the deliveries with my brothers as well, Brayan Alexander Oliveros Cheros and Jhonnatan Kevin Guevara Morales. In the Propatria sector (Las Barras), my father had his business and many other people where each of them was extorted monthly. They were directly supported by the government of Nicolás Maduro; the group was called or is called "Los Colectivos" and it was something that was impossible to stop. In one of the "vaccine" collections, my

10

older brother realized what happened because my dad was arguing because sometimes there were weeks where the money was made to pay for the vaccine and sometimes not. Death of my brother! My brother dies because of the argument that my father had with the collectives about the vaccine, on 09/03/2017. They intercepted him when my brother was taking a delivery; the event happened in a sector called Niño Jesús de Propatria, where they have total control of the population.

That affected me a lot, as well as my mother, my father and my grandmother. My brother had a family, including a daughter; that changed our lives and that was when we decided to leave Venezuela for Peru, Lima. My brother's death was the reason we left Venezuela; In addition, the situation was bad, the money was not enough to buy food, the electricity went out and there was no water. We arrived in Peru in 2018, where my grandfather received us, who is the father of my mother of Peruvian nationality. I worked as a candy seller in the Jirón Ayacucho sector, in downtown Lima. I worked there for both years, I got together, I bought a 3-wheeled motorcycle, and I worked as a motorcycle taxi until 2023. It was when we decided to come to the United States of America for the "American dream", for a better life and to get our family ahead.

I arrived in the United States May 4, 2023, or 2024, I don't remember. I arrived at the shelter at 2912 Queens Plaza. I got a construction job, but not a steady job; He did not have papers or a work permit. They only let me stay a month and a half in the Queens Plaza shelter and I had to rent a room in the Bronx (3363 Cruger Ave).

It was where I saw perfumes being taken out of stores and warehouses, and I began to do the same; That's how I paid for my room, but I've never hurt anyone. In the month of July, I met people whom I regret having met; from July 2024 to 2025 I was linked to people from the Tren de Aragua, which I regret having met.

I want to ask forgiveness from God, from you, Madam Judge, and from the government of the United States. Madam Judge, with all due respect, I dare to write this letter not to justify my actions, but so that you know my situation: I have an 8-year-old son, and the bad economic situation led me to commit acts that I should never have committed. These 17 months in prison have made me reconsider and think a lot about the future. I ask your mercy, Madam Judge; In my future plans is a family life, changing my son's future by changing mine with good deeds and a legal job next to my mom, dad and siblings.

In closing, Madam Judge, I would like to ask you to consider my conviction to the slightest extent you can. From the bottom of my heart, thank you very much; My son, my family and especially me thank him. I will not disappoint her, and I will always be a better person.

11

>Thank you very much for the opportunity.
>Sincerely: *Sandro Junior Oliveros Cheros.*

***The "nature and circumstances" surrounding Sandro's crime are mitigating factors that warrant a sentence below the advisory guideline range.***

Sandro does not make excuses for being a member of this conspiracy that engaged in serious crimes.  Plainly from his plea allocution, he has admitted involvement and is fully aware he faces a serious sentence because of the choices he made.  In fact, he is the first one in the multi-defendant-multi-Indictment case to change his plea to guilty.  He does not seek to minimize his behavior.  He understands he has let himself and his family down.  You can hear it in his voice.

When considering the "nature and circumstances" surrounding a defendant's conduct under §3553, though, the Court is urged to keep in mind that Sandro was not one who was high-level, active, engaged in violent crimes, or a decision-making member of this conspiracy.  Far from it.  Although Sandro admits to possessing and distributing the "Tusi," as well as possessing firearms inside his home (a home where other co-defendants resided), it is important to keep his conduct in perspective in relation to the more culpable members of the conspiracy whose conduct as itemized in the Indictment and discovery is more severe. In particular, the government does not allege that Sandro personally trafficked any firearms, harmed anyone, robbed anyone, threatened anyone, or engaged in human smuggling or sex trafficking – as alleged against several of the other defendants.

The reality of the "nature and circumstances" surrounding Sandro's conduct in relation to the other defendants does not make it any less criminal or wrong, but it does

12

serve as a form of mitigation and help justify this Court this Court to consider our request for a below guideline sentence of 5 years.

### *A Sentence of Sixty Months can Provide Adequate Deterrence, Protect the Public from Future Offenses, and is just punishment.*

The requested 5-year sentence can provide adequate specific and general deterrence.  A 5-year sentence for a 26-year-old Sandro, coupled with the certainty of his removal from the United States back to Venezuela is a serious sentence.   After serving a 5-year sentence, Sandro will lose a meaningful part of his youth – his mid to late 20's.  For someone like Sandro, who's prior criminal history mainly includes shoplifting and larceny crimes, and who has never done any perceptible jail time, a 5-year sentence will send a message – certainly to him.  One can assume that when Sandro returns to Venezuela he will think twice before joining a gang, committing crimes or attempting to enter the US illegally.  Furthermore, at best, it is difficult to conclude that a guideline sentence of 7 or 7 ½ years will serve as adequate deterrents, but 5 years will not.  Said another way, if a 7-year sentence will serve as a deterrent from engaging in criminal conduct, should not a 5-year sentence as well?    Therefore, the parsimony clause that a sentence should be sufficient but not greater than necessary should control and warrant a below guideline sentence of 5 years.

A five-year sentence will also protect the public from any future offenses Sandro may commit.  Aside from the time Sandro remains incarcerated, temporarily separated from society for 5 years, his certain removal back to Venezuela, because of this conviction, will avoid any potential risk to the public in the future.

### IV.    **CONCLUSION**

Sandro presents a complicated picture.  On one hand, he came from a good and stable family that reinforced good values like hard work and education. For a good part of Sandro's youth, he had lived a life exemplifying those values by studying, working and behaving well.  So how does one turn so dramatically?  The brutal death of his uncle by his own government in Venezuela affected him deeply and changed the course of his life for the worse.  Plainly, that heinous murder, at the hands of a dictator, was the catalyst – not the excuse - for making ill-fated choices like joining a gang and engaging in criminal conduct.

The Court is urged to focus equally on what Sandro has the potential of accomplishing in the future, not only on what he did wrong to get him here in the first place.  From his letter to the Court, one can hear in Sandro's voice self-awareness and the deep regret that he chose to commit the criminal acts.  The crimes he committed were serious, but so is a 5-year sentence at his age of 26.   Judging from his past, there is still hope for Sandro to exercise his true potential.  A 5-year sentence will reflect that hope.

**WHEREFORE**, it is respectfully requested that this Honorable Court consider the contents of this motion prior to imposing sentence upon Sandro and sentence him to 5 years.

**I CERTIFY** that a copy of this memorandum has been served to the Court ECF.  This memorandum has also been served on the U.S. Attorney's Office for the Southern District *via* ECF.

**RESPECTFULLY SUBMITTED.**
In New York, New York, February 26, 2026

SULLIVAN|BRILL, LLP



_____
By: Steven Brill
Attorneys for Sandro Oliveros Chero
110 East 59th Street, Floor 23
New York, New York
(212) 566-1028
E-Mail: steven.brill@sullivanbrill.com

15