

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

March 2, 2026

**BY ECF AND EMAIL**

The Honorable Denise L. Cote
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:    **United States v. Sandro Oliveros-Chero, 25 Cr. 41 (DLC)**

Dear Judge Cote:

The Government respectfully submits this letter in advance of the sentencing of defendant Sandro Oliveros-Chero. For the reasons below, the Government respectfully submits that a sentence within the stipulated Guidelines Range of 84 to 90 months' imprisonment (the "Stipulated Guidelines Range" or "Guidelines Range") would be sufficient but not greater than necessary to serve the purposes of sentencing.

**A.    Factual Background**

Since at least 2024, the defendant has been a member of Tren de Aragua ("TDA"), a transnational criminal organization[1] that originated in Venezuela and that has since spread throughout the Western Hemisphere, including the United States. TDA enriches itself through human smuggling and the sex trafficking of young women (whom members of the gang referred to as "multadas"), armed robberies, firearms and ammunition trafficking, and the trafficking of controlled substances, including methamphetamine, marijuana, and a mixed substance called "tusi" that contains ketamine. TDA protects and expands its power and territory through brutal violence and threats of violence, including killings, shootings, and other forms of violence. (Presentence Investigation Report ("PSR") ¶¶ 15-16).

The defendant, who has no immigration lawful status in the United States, sold drugs on behalf of TDA and carried one or more guns in furtherance of drug trafficking.

---

[1]    On February 20, 2025, the State Department designated TDA a foreign terrorist organization ("FTO"). The defendant was arrested (and his offense conduct terminated) before the FTO designation.

On October 9, 2024, law enforcement officers executed a warrant to search a residence in the Bronx, where the defendant and his brother (and co-defendant) Brayan Oliveros-Chero lived.[2]

In the defendant's bedroom, law enforcement found a loaded blue-and-gray Glock 9mm pistol, a separate extended magazine containing additional 9mm ammunition, and a box of .40 caliber ammunition. In the same bedroom, law enforcement found a plastic bag containing "tusi," which was tested and confirmed to contain ketamine and methamphetamine, multiple plastic bags containing marijuana, and a digital scale. The same room also held a wallet with the defendant's identification documents. Photographs of the items recovered from the bedroom appear below.



---

[2]     On October 7, 2024, two days before this search, the defendant was driving a vehicle that was pulled over by police officers. In the front console of the vehicle was a digital scale that bore traces of drug residue. Officers later found packets of "tusi," which tested positive for ketamine, inside the vehicle.



In another bedroom in the same apartment, which appeared to have been used by the defendant's brother Brayan Oliveros-Chero, law enforcement found a loaded .40 caliber "ghost gun," a separate extended magazine containing .40 caliber ammunition, and two loose rounds of .40 caliber ammunition, as well as various controlled substances, including approximately 43 multi-colored tablets that were confirmed to contain methamphetamine, parcels of marijuana packaged for sale, and strips of an apparent controlled substance. (PSR ¶¶ 20-22).

During the investigation, law enforcement executed a search warrant on the contents of devices belonging to the defendant's brother.  One of those cellphones contained, among other things, video recordings of the defendant brandishing a firearm, the blue-and-gray Glock pistol sitting next to apparent "tusi" and cash, and the defendant packaging tusi for sale. (PSR ¶ 23). Still images from those recordings appear below.






Additionally, on the defendant's brother's cellphone, law enforcement found a chat in which an individual said "I'm going to pass by with Sandro's 50 can you have 20 of marijuana ready for me?" a reference to the defendant's involvement in drug trafficking. (PSR ¶ 23(d)).

## B.  Procedural History and Guidelines Calculation

The defendant was arrested on February 18, 2025 on a Complaint charging him with conspiring to distribute controlled substances, in violation of 21 U.S.C. § 846; using and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; conspiring to use and possess a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o); and possessing a firearm and ammunition as an illegal alien, in violation of 18 U.S.C. § 922(g)(5).[3]

On March 19, 2025, a grand jury sitting in the Southern District of New York returned an Indictment containing the same charges contained in the Complaint. On April 21, 2025, the Court unsealed a Superseding (S1) Indictment charging the defendant with the same offenses contained in the Indictment and also charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). On September 16, 2025, the Court unsealed a second Superseding (S2) Indictment charging the defendant with the same offenses contained in the S1 Indictment.

_____

[3] The Complaint also charged Brayan Oliveros-Chero with possessing ammunition as an illegal alien, in violation of 18 U.S.C. § 922(g)(5).

On November 20, 2025, pursuant to a plea agreement (the "Plea Agreement"), the defendant pleaded guilty before this Court to Counts One and Ten of the S2 Indictment, which respectively charged him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

In the Plea Agreement, the parties stipulated to the Guidelines calculations below:

1. The Guidelines Manual in effect as of November 1, 2024 applies in this case.

Count One

2. The Guideline applicable to Count One is U.S.S.G. § 2E1.1.  Pursuant to U.S.S.G. § 2E1.1(a), the base offense level is the greater of 19 or the offense level applicable to the underlying racketeering activity, each after application of Chapter Three, Parts A, B, C, and D of the Guidelines.

3. The Guideline applicable to the predicate offense of a drug-trafficking conspiracy, in violation of 21 U.S.C. § 846, is U.S.S.G. § 2D1.1.

4. Pursuant to U.S.S.G. § 2D1.1(a)(5), (c)(14), and Application Note 5, the base offense level is 12 because the defendant was responsible for distributing and possessing with intent to distribute between at least 5 kilograms and 10 kilograms of converted drug weight, calculated as such: (i) 4.25 grams of substances containing methamphetamine (8.5 kg) (ii) 213.79 grams of marijuana (converted drug weight of .214 kilograms); (iii) .02 grams of 4-Bromo-2,5-Dimethoxyamphetamine (converted drug weight of .05 kilograms), yielding a total converted drug weight of 8.764 kilograms.

5. Pursuant to U.S.S.G. § 2D1.1(b)(12), two levels are added because the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.

6. Pursuant to U.S.S.G. § 2E1.1(a), because 19 is greater than the 14 levels from the drug-trafficking conspiracy, the offense level for Count One is 19.

7. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 16.

Count Ten

8.  The Guideline applicable to the offense charged in Count Ten is U.S.S.G. § 2K2.4.

9.  Pursuant to U.S.S.G. § 2K2.4(b), the Guidelines sentence for Count Ten is the minimum term of imprisonment required by statute, here a mandatory minimum term of imprisonment of 60 months' imprisonment, to run consecutively to any other term of imprisonment imposed, pursuant to U.S.S.G. § 2K2.4(b) and 18 U.S.C. § 924(c)(1)(A)(i).

The parties further stipulated that the defendant fell within Criminal History Category II. Based on the foregoing, the parties agreed that the Stipulated Guidelines Range—inclusive of the 60-month mandatory consecutive sentence for Count Ten—was 84 to 90 months' imprisonment.

The Probation Office recommends that the defendant be sentenced to an 84-month term of imprisonment.

## C. Discussion

### 1. Applicable Law

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence for criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2.   The Court Should Impose a Guidelines Sentence

The Government respectfully submits that a Guidelines sentence is necessary to reflect the seriousness of the offenses, to deter the defendant and others from engaging in similar conduct, to promote respect for the law, and to protect the public.

*First*, a sentence within the Guidelines Range would reflect the nature and seriousness of the offenses. Gun violence is a terrible scourge on the communities in the Southern District of New York. The defendant contributed to that scourge by possessing a firearm, ammunition, and an extended magazine, as well as ammunition for a firearm that his brother possessed. The seriousness of the defendant's criminal conduct is compounded by his illegal presence in the United States and his possession of the firearms and ammunition in furtherance of the drug trafficking that he committed as part of his membership in the violent gang TDA. The deadly mix of firearms, drugs, and allegiance to a violent gang could easily have led to grievous injuries and deaths of innocent persons. A punishment within the Guidelines range would account for how the defendant's criminal conduct exposed the greater community to such unacceptable risk of danger.

*Second*, a sentence within the Guidelines Range is necessary to promote respect for the law, protect the community, and adequately deter the defendant and others. Although the defendant does not have a lengthy history of convictions in the United States,[4] he has, in the short time he has been in the United States, amassed eight pending cases for theft of thousands of dollars' worth of luxury items. (PSR ¶¶ 61-68). He has also been arrested as part of a traffic stop in which he and two other individuals were in a vehicle that had a "ghost gun." (PSR ¶ 70). His repeated arrests clearly show a lack of respect for the law. Moreover, defendants who commit firearm offenses have the highest rate of recidivism at 70.6%. *See Recidivism of Federal Offenders Released in 2010*, pp. 5, 32, https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Importantly here, even though there was a general decline in recidivism rates with increased age, the recidivism rate for firearm offenders remained high across all ages, even for those who were released between the ages of 31 and 40. *See Recidivism Among Federal Firearms Offenders*, p. 28. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190627_Recidivism_Firearms.pdf (Recidivism rate of 69% for firearm offenders released between 31-35 years old, 64.9% for firearm offenders released between 35-40).

*Third*, a sentence within the Guidelines Range would take into account the defendant's characteristics and history. Unlike so many others who are sentenced in this District, the defendant here had all the support and opportunities to make the right decisions. He grew up in a stable household with "two really excellent parents" and "always had food." (PSR ¶ 74). Rather than follow his parents' example of hard work and abiding by the law, he turned to drug dealing and the possession of firearms. In light of all this, like Probation, the Government believes that there are no mitigating factors warranting a sentence below the Stipulated Guidelines Range, particularly when balanced against the seriousness of his conduct, his blatant lack of respect for the law, the need to deter those who think about trafficking firearms and drugs, and the need to protect the community from deadly firearms.

---

[4] The Government does not have access to criminal history records from Venezuela.

In sum, a sentence within the Guidelines Range would adequately balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

### D.  Conclusion

For the reasons set forth above, the Court should impose a sentence of imprisonment within the Guidelines Range.[5]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:     /s/_____
Timothy Ly / Kathryn P. Wheelock /
Jun Xiang / Andrew K. Chan
Assistant United States Attorneys
(212) 637-1062 / -2415 / -2289 / -1072

Cc:     Steven Brill, Esq.

---

[5] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court imposes, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).